Claire Loebs Davis, WSBA #39812
ANIMAL & EARTH ADVOCATES, PLLC
20520 105th Ave. SW
Vashon, WA 98070
Tel: (206) 601-8476
claire@animalearthlaw.com

Jennifer Schwartz, WSBA #38388
WILDEARTH GUARDIANS
213 SW Ash Street, Suite 202
Portland, OR 97204
Tel: (503) 780-8281
jschwartz@wildearthguardians.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, KETTLE RANGE CONSERVATION GROUP, AND WILDEARTH GUARDIANS,<br><br>Plaintiffs,<br><br>     v.<br><br>U.S. FOREST SERVICE, TOM SCHULTZ, Chief of the U.S. Forest Service, JACQUELINE BUCHANAN, Pacific Northwest Regional Forester, U.S. Forest Service, JOSH WHITE, Forest Supervisor, Colville National Forest,<br><br>Defendants. | Case No. 2:25-cv-00418<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act |

1

# I.  INTRODUCTION

1.  Plaintiffs challenge the final Record of Decision ("ROD") adopting the U.S. Forest Service's 2019 Colville National Forest Land Management Plan ("Forest Plan"), and the subsequent grazing authorizations, including the reissuance of Term Grazing Permits ("Grazing Permits") for 25 grazing allotments, for allowing excessive and harmful cattle grazing in the Colville National Forest ("Colville Forest" or "Forest"), leading to long-term damage to the forest ecosystem.



*A view of the Forest from Copper Butte in the Lambert grazing allotment, looking south toward Sherman Pass. (Photo courtesy of Kettle Range Conservation Group.)*

2.  The 1.1 million-acre Colville Forest is part of the northern Rocky Mountains, with the Kettle River Range on the west and the Selkirk Mountains on the east. It is largely comprised of densely forested, rugged terrain, including old-growth forests and peaks rising to 7,000 feet, with diverse meadow and riparian habitats. The Forest provides habitat for a wide variety of fish and wildlife, including

COMPLAINT – 2

species listed at the federal and state levels. It also supports many forms of recreation, as well as extractive uses such as timber harvest and livestock grazing.

3.     In 2019, the Forest Service revised its land management plan for the Colville Forest for the first time in more than three decades. Prior to this planning process, cattle grazing allotments covered 66% of the Forest. However, in the course of updating its plan, the Forest Service conducted an analysis that revealed that only 26% of the Forest is suitable for cattle grazing. At the same time, the Forest Service acknowledged that historic overgrazing has "degraded range conditions" and has impaired "important unique habitats such as riparian areas and meadows."

4.     Despite this information, the Forest Service made no adjustments to its grazing management policies at either the Forest Plan level or the allotment-specific level to prevent overgrazing from continuing to damage the Forest.

5.     Indeed, in the final Environmental Impact Statement ("FEIS") supporting the Forest Plan, the Forest Service did not consider any adjustment to the "number of livestock, the intensity of grazing, or the amount of area grazed." The Forest Plan thus continues to allow the same number of cattle to graze at the same level of intensity and on the same grazing allotments, even though the Forest Service has determined that nearly 70% of the land in these allotments is not capable or

suitable for cattle grazing.[1] This includes continuing to allow cattle to graze throughout five allotments where less than 6% of the land is capable and suitable for grazing, and throughout 28 allotments where less than 25% of the land is capable and suitable.

6.    The Forest Service failed to meet the statutory and regulatory requirements for the Forest Plan, including by failing to: (1) adjust the intensity of grazing, the number of livestock grazed, and/or the areas in which grazing is allowed in accordance with its capability and suitability analysis; (2) properly evaluate the suitability and capability of the Forest to sustain grazing; (3) adequately identify those lands it deemed not capable and not suitable for grazing; (4) take the required "hard look" at the impacts of grazing on valuable habitats, sensitive riparian areas, vulnerable wildlife populations, and recreational uses; and (5) consider a reasonable range of grazing management alternatives.

7.    The Forest Plan provides that additional changes to grazing practices may be made for specific grazing allotments. However, no such changes were made

_____

[1] Analysis of data obtained from the Forest Service through a public disclosure request shows 727,726 acres of Forest in cattle grazing allotments. Of these acres, the Forest Service determined 225,745 are suitable for cattle grazing, or about 31%. The other acreage deemed suitable for cattle grazing is not in current allotments.

in advance of the last six annual grazing seasons that have followed the adoption of the Forest Plan. The Forest Service thus failed in its responsibility to revise management of these grazing allotments "as soon as practicable" to accommodate the new information from its suitability and capability analysis.

8.    The Forest Service's continued authorization of destructive grazing practices and chronic overgrazing has caused, and will continue to cause, significant ecological damage to the Forest, leading to the degradation of sensitive areas such as streams and meadows, the destruction of valuable fish and wildlife habitat, the killing of ecologically important native predators as a result of conflicts with cattle, and a decrease in the value of the Forest for recreational uses.

9.    The Forest Service's failure to properly analyze and regulate grazing in the Forest violates the National Forest Management Act ("NFMA"), the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), and the regulations implementing those statutes. Accordingly, Plaintiffs challenge the Forest Plan, the final Record of Decision ("ROD") approving the Plan, and the Forest Service's subsequent Colville grazing authorizations. Plaintiffs seek remand of the Forest Plan, suspension of the grazing authorizations, and an injunction to restrict grazing activities in the Colville Forest to prevent continued harm to the ecosystem until the Forest Service complies with these governing laws.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA), 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), 2412 (costs and fees) and 1346 (United States as a defendant). This cause of action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701-706, NEPA, 42 U.S.C. §§ 4321-4370m-12, NFMA, 16 U.S.C. §§ 1600-1614 and those statutes' implementing regulations.

11.     The actions challenged are final agency actions, or actions unlawfully withheld or unreasonably delayed, properly subject to judicial review under the APA. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

12.     Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

13.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## III.     PARTIES

14.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a nonprofit membership organization with over 14,000 members and supporters, which is dedicated to protecting and restoring the public lands, wildlife, and

watersheds in the American West. WWP, as an organization and on behalf of its members, is concerned with, and active in, seeking to protect and improve the wildlife, riparian areas, water quality, fisheries, and other natural resources and ecological values of watersheds throughout the West and in Washington state. WWP has a longstanding interest in the management of livestock grazing in the Colville Forest, and in ensuring that any such grazing is ecologically sustainable and achieves peaceful coexistence with all species of native wildlife.

15.   Plaintiff KETTLE RANGE CONSERVATION GROUP ("KRCG") is a rural, grassroots, non-profit environmental charity formed in 1976 in Republic, Washington, with a membership of 500. KRCG's mission is to defend wilderness, protect biodiversity, and restore ecosystems of the upper Columbia River Basin. KRCG's project work includes oversight of federal management of the Okanogan and Colville National Forests, promotion of dry and damaged forest restoration, environmental education to citizens, business and community groups, preservation of wilderness, and protection of fish and wildlife. KRCG is a founding member of the board of Northeast Washington Forest Coalition, a collaborative created in 2003 between timber industry, forest and wildlife conservation, and recreation interests.

16.   Plaintiff WILDEARTH GUARDIANS ("Guardians") is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and the health of the American West. Guardians has more than

275,000 members and supporters across the West, including those who reside in Washington and visit the Colville National Forest. Guardians maintains offices in several states, including Portland, Oregon; Seattle, Washington; Missoula, Montana; Denver, Colorado; and Santa Fe, New Mexico. Guardians has a long history of working to protect and restore public lands and native species across the West, including wolves, grizzly bear, lynx, wolverine, bull trout and whitebark pine.

17.    Plaintiffs bring this action on their own behalf and on behalf of their members and supporters, many of whom live near the Colville Forest, or visit it for recreational and professional pursuits. Plaintiffs' members, supporters, and staff gain aesthetic enjoyment from using and enjoying the Colville Forest for recreation, including hiking, skiing, camping, backpacking, boating, fishing, and wildlife viewing. Plaintiffs' members, supporters, and staff have engaged in these activities in the past and intend to do so again in the near future. They gain aesthetic enjoyment from the beauty of the natural forest, including the meadows and riparian areas that are damaged by livestock grazing, as well as from observing, attempting to observe, hearing, seeing evidence of, and studying many species of fish and wildlife that live in the Forest. The opportunity to enjoy the beauty of the natural forest and its wildlife is of significant interest and value to Plaintiffs' members, supporters, and staff, and they are dedicated to ensuring the long-term health of the Forest and its wildlife. The legal violations alleged in this Complaint therefore cause direct injury to the

aesthetic, conservation, recreational, scientific, educational, inspirational, and wildlife preservation interests of Plaintiffs and their members, supporters, and staff.

18.     Plaintiffs participated in the comment and objection phases of the development of the Forest Plan on behalf of their members, supporters, and staff, who have an interest in ensuring that the Forest Service complies with all applicable federal statutes and regulations authorizing domestic livestock grazing on federal forest lands. Plaintiffs' members, supporters, and staff have an interest in ensuring that the Forest Service fulfills its obligation to manage the Colville Forest in a manner that does not impair the diversity and viability of native wildlife that live there, or impair other uses or ecological values of the Forest. The interests of Plaintiffs, their members, supporters, and staff have been, and are being, adversely and irreparably injured by Defendants' failure to comply with federal law, and this injury will continue until and unless the relief requested in this Complaint is granted. These are actual, concrete injuries, traceable to Defendants' conduct, that would be redressed by the requested relief.

19.     Defendant UNITED STATES FOREST SERVICE is an agency of the United States within the Department of Agriculture and is charged with managing the public lands and wildlife of the Colville National Forest, in accordance and compliance with NEPA, NFMA, the APA, and their implementing regulations.

20. Defendant TOM SCHULTZ is the Chief of the U.S. Forest Service, who along with other individual defendants, is sued solely in his official capacity.

21. Defendant JACQUELINE BUCHANAN is the Pacific Northwest Regional Forester for the U.S. Forest Service.

22. Defendant JOSH WHITE is the Forest Supervisor for the Colville Forest, responsible for the management of the Colville Forest and its compliance with NEPA and NFMA requirements.

23. Defendants are collectively referred to as the "Forest Service."

## IV. LEGAL BACKGROUND

### A. National Forest Management Act

24. NFMA is the primary statute governing the administration of national forests. 16 U.S.C. §§ 1600-1614. NFMA and its implementing regulations provide for forest planning and management by the Forest Service on both the forest level and the individual project level.

25. At the forest level, NFMA requires the Forest Service to develop, maintain, and revise a Land and Resource Management Plan ("Forest Plan") for each national forest. 16 U.S.C. § 1604(a). Forest Plans consist "of broad, long-term plans and objectives for the entire forest," *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1109 (9th Cir. 2018), and are "designed to manage forest

1    resources by balancing the consideration of environmental and economic factors,"

2    *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

3        26.    A Forest Plan must establish natural resource management practices

4    forest-wide, setting standards, management goals and objectives, desired conditions

5    and monitoring and evaluation requirements. Forest Plans must also provide for

6    sustained yields and multiple uses, including the coordination of outdoor recreation,

7    livestock grazing, timber harvest, and soil conservation, as well as the protection of

8    watersheds, riparian areas, wilderness, fish and wildlife species habitat and diversity.

9    16 U.S.C. § 1604(e), (g). The Forest Service must provide for and foster public

10   participation in the development, review, and revision of Forest Plans. *Id.* § 1604(d).

11       27.    NFMA requires the Forest Service to adopt regulations specifying

12   guidelines for Forest Plans. *Id.* § 1604(g)(3); *see* 36 C.F.R. Part 219. The guidelines

13   must ensure that Forest Plans "provide for diversity of plant and animal communities

14   based on the suitability and capability of the specific land area in order to meet

15   overall multiple-use objectives[.]" 16 U.S.C. § 1604(g)(3)(B).

16       28.    The Forest Service adopted forest planning regulations in 1982. 47 Fed.

17   Reg. 43,037-43,052 (Sept. 30, 1982) ("1982 Rules").[2] The Forest Service revised

18   the regulations in 2012, but with transitional provisions allowing the Forest Service

---

[2] Citations to the 1982 Rules will be in the form "1982 Rules § 219.xx."

COMPLAINT – 11

1    to elect to apply portions of the 1982 Rules to the development or revision of Forest

2    Plans initiated prior to 2012. 36 C.F.R. § 219.17(b)(3). The Forest Service largely

3    elected to apply the 1982 Rules to the development of the Forest Plan.[3]

4    29.    The 1982 Rules require the Forest Service to obtain, and keep current,

5    appropriate data for planning and managing the resources under its jurisdiction. 1982

6    Rules § 219.12(d). The 1982 Rules specify that "[plant and animal] diversity shall

7    be considered throughout the planning process" and "[i]nventories shall include

8    quantitative data making possible the evaluation of diversity in terms of its prior and

9    present condition." 1982 Rules 219.26. Although NFMA does not require the

10    Service to adhere to any particular methodology to comply with the Diversity

11    Mandate, it must explain why its chosen methodology is reliable. *Lands Council v.*

12    *McNair*, 537 F.3d 981 (9th Cir. 2008).

13    30.    The 1982 Rules require the Forest Service to make a determination

14    during the planning process regarding the capability of national forest lands of

---

[3] The Service elected to use some portions of the new 2012 regulations, including provisions in 36 CFR 219.15 that require that all pre-existing permits and contracts be made "consistent with the plan…as soon as practicable," and that all projects, permits, and other activities authorized after approval of the Plan must be "consistent with the Plan." *See* 36 CFR 219.15(a) and (b).

1    sustaining domestic livestock grazing, and their suitability for that purpose, and to

2    determine the condition and trend of the lands used for grazing. 1982 Rules § 219.20.

3        31.    Capability refers to the potential of an area of land to produce particular

4    resources, such as forage to support the needs of both native wildlife and domestic

5    livestock, which in turn depends on the physical components of the area such as

6    climate, slope, landform, soils, and geology, as well as the application of

7    management practices. *Id.* § 219.3. Suitability, on the other hand, is the

8    appropriateness of applying certain management practices to a particular portion of

9    the forest, "as determined by an analysis of the economic and environmental

10   consequences and the alternative uses forgone." *Id.*

11       32.    The Forest Service must substantively implement the results of its

12   capability and suitability analyses in each Forest Plan. In each Forest Plan, the Forest

13   Service must "provide for diversity of plant and animal communities *based on the*

14   *suitability and capability* of the specific land area in order to meet overall multiple-

15   use objectives[.]" 16 U.S.C. § 1604(g)(3)(B) (emphasis added). Each Forest Plan

16   must also "determine forest management systems … and procedures in light of …

17   the availability of lands and their *suitability* for resource management." 16 U.S.C.

18   § 1604(e)(2) (emphasis added).

19       33.    In developing Forest Plans that involve grazing, the Forest Service must

20   present and consider a range of grazing alternatives. The 1982 Rules provide that:

Alternative range management prescriptions shall consider grazing systems and the facilities necessary to implement them; land treatment and vegetation manipulation practices; and evaluation of pest problems; possible conflict or beneficial interactions among livestock, wild free-roaming horses and burros and wild animal populations, and methods of regulating these; direction for rehabilitation of ranges in unsatisfactory condition; and comparative cost efficiency of the prescriptions.

1982 Rules § 219.20(b).

34.     The Forest Service's guidance recognizes that suitability is an "alternative specific" determination, such that different alternatives considered in the planning process will involve different acreage amounts and different areas of the forest being deemed suitable for grazing. *See* U.S. Forest Service, Rangeland Suitability for Livestock Grazing at the Forest Plan Level and Standards for NEPA Display (rev. March 2003), at 8. Changes to suitability determinations "involve making changes at the Forest Plan level, as suitability is a Forest Planning level determination." *Id.*

35.     Through the planning process, the Forest Service must develop alternatives that reflect a full range of commodity (e.g. livestock) and environmental resource uses, and the value produced by these alternatives, including the evaluation of uses that cannot be assigned a monetary value. *See* 1982 Rules § 219.12(f). This range of alternatives must be adequate to compare various combinations of outputs and uses, including commodity production, ecological values, and recreational values, in order to identify an alternative that maximizes the monetary and non-

COMPLAINT – 14

monetary social and economic values produced by the forest. *See* 1982 Rules §§ 219.1(a), .4(a)(1), .12 and .27.

36.    After a Forest Plan is approved, the Forest Service must implement the Forest Plan through site-specific actions. NFMA requires that "permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i); *see* 1982 Rules § 219.10(e).[4] A project or activity is consistent if it conforms to the applicable components of the Forest Plan, including its goals, objectives, standards, guidelines, desired conditions, and monitoring requirements. 36 C.F.R. § 219.15; Forest Service Handbook ("FSH") 2209.13 § 91.1.

37.    When Forest Plans are revised, NFMA requires that "resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans." 16 U.S.C. § 1604(i); *see* 1982 Rules § 219.10(e) ("As soon as practicable after approval of the plan," the Forest Service shall ensure that "all outstanding and future permits, contracts, cooperative agreements, and other instruments for occupancy and use of affected lands are consistent with the plan."). The Forest Service's failure to comply

---

[4] *See also,* 36 C.F.R. § 219.15 (2012).

with the provisions of a Forest Plan through its site-specific actions is a violation of NFMA.

**B. Federal Land Policy and Management Act**

38.    The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, governs the management of federal public lands generally, and includes specific provisions regarding the management of federally-permitted domestic livestock grazing on these public lands, *id.* §§ 1751-1753. The implementing regulations regarding range management are at 36 C.F.R. Part 222.

39.    The Forest Service allows livestock grazing on specified "allotments" within national forests. 43 U.S.C. § 1752; 36 C.F.R. § 222.1(b). The Forest Service manages livestock grazing on an allotment through an Allotment Management Plan ("AMP"), Grazing Permits issued in accordance with the AMP, and annual operating instructions ("AOIs") that guide grazing on a year-to-year basis. Each of these is a site-specific action which must be consistent with the Forest Plan. *Buckingham v. Sec'y of U.S. Dept. of Ag.*, 603 F.3d 1073, 1077 (9th Cir. 2010).

40.    The Forest Service prepares an AMP for each allotment, which must specify a "program of action" to meet the "multiple-use, sustained yield, economic, and other needs and objectives as determined for the lands involved." 36 C.F.R. §§ 222.1(b)(2), 222.2(b); 43 U.S.C. § 1702(k)(1). In contrast to a Forest Plan, which is an "overarching land management directive for an entire forest-wide unit," an

AMP is a "land management directive for a specific allotment within a national forest that the Forest Service has designated for livestock grazing." *See Or. Nat. Desert Ass'n v. United States Forest Serv.*, 465 F.3d 977, 980 (9th Cir. 2006). Each AMP must be consistent with the applicable Forest Plan, and when a plan is revised, "shall be revised as soon as practicable to be made consistent with such plans." *Id.*; 16 U.S.C. § 1604(i); 36 C.F.R.§ 222.2(c).

41.    A permit grants a specific license to graze on an allotment, and establishes: (1) the number, (2) kind, (3) and class of livestock, (4) the allotment to be grazed, and (5) the period of use. *Or. Nat. Desert Ass'n*, 465 F.3d at 980; 36 C.F.R. §§ 222.1, 222.3; 43 U.S.C. § 1752. The Forest Service generally issues Grazing Permits for ten-year periods. 36 C.F.R. § 222.3(c)(1). The terms and conditions of a Grazing Permit must be consistent with the AMP; they may be canceled if the land under permit is to be devoted to another public purpose, and may be modified to comply with the provisions of an AMP or other management needs, including resource protection measures. 36 C.F.R. § 222.4(a).

42.    The Forest Service also issues yearly instructions to holders of national forest Grazing Permits through annual operating instructions ("AOIs"). FSH § 94.3. AOIs are used to respond to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or Grazing Permit. *Or. Nat. Desert Ass'n*, 465 F.3d at 980–81.

**C. National Environmental Policy Act**

43.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[5] NEPA requires agencies to take a "hard look" at the consequences of prospective actions by ensuring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To that end, NEPA requires federal agencies to prepare a detailed EIS for all major federal actions that may significantly affect the quality of the human environment. 42 U.S.C. § 4332(C). An EIS must consider a "full spectrum" of reasonable alternative actions. *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, 46 Fed. Reg. 18,026 (March 23, 1981) (as amended in 1986); *see* 40 C.F.R § 1502.14.

---

[5] All citations are to the 1978 Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. Part 1500, which were in effect when the Service approved the 2019 Forest Plan and ROD, and which these documents purport to follow. On February 25, 2025, the Trump Administration issued a final rule removing the CEQ regulations from the Code of Federal Regulations effective April 11, 2025. *See* 90 Fed. Reg. 10610 (February 25, 2025).

1     44.     NEPA also requires that the public have access to the EIS, to ensure
2 that "the relevant information will be made available to the larger audience that may
3 also play a role in both the decision-making process and the implementation of that
4 decision." *Robertson*, 490 U.S. 332, 349; *see also* 40 C.F.R. §§ 1500.1(b) and
5 1506.6(d).

6     45.     Under NEPA, agencies must "consider every significant aspect of the
7 environmental impact of a proposed action" in an EIS. *Or. Natural Desert Ass'n v.*
8 *BLM*, 625 F.3d 1092, 1100 (9th Cir. 2010). This includes studying the direct,
9 indirect, and cumulative impacts of an action. 40 C.F.R. §§ 1508.7, 1508.8.

10     46.     The Forest Service uses the NEPA process for the development of its
11 Forest Plans, as well as for the development of most site-specific plans, including
12 AMPs and Grazing Permits.

13     47.     The Rescissions Act (P.L. 104-19) was passed by Congress in 1995.
14 Section 504 of the Act was proposed in response to the growing number of
15 allotments for which the Forest Service was required to conduct NEPA analyses, but
16 had failed to do so before reissuing expired Grazing Permits. The Rescissions Act
17 addressed the issue of assessing grazing allotments, reissuing Grazing Permits, and
18 agency compliance with NEPA, by allowing the Forest Service to renew soon-to-
19 expire permits on allotments without current NEPA decisions as long as their
20 respective allotments were on a schedule for completion.

48.    Section 504(a) states that each National Forest shall "establish and adhere to a schedule" for the completion of NEPA analysis and decisions on all allotments where NEPA analysis is needed. Section 504(b) states that "notwithstanding any other law, term Grazing Permits which expire or are waived before the NEPA analysis…shall be issued on the same terms and conditions and for the full term of the expired or waived permit."

49.    To comply with the Rescissions Act, the Forest Service published a NEPA Allotment Schedule in 1996 that displayed allotments in need of and scheduled for NEPA analysis over a 15-year span, from 1996-2010. Following two court cases in the early 2000s in which litigants successfully argued that the Forest Service had no authority to subsequently modify their original NEPA schedule, Congress enacted the 2004 Interior Appropriations Act (P.L. 108-108).

50.    Section 325 of the 2004 Interior Appropriations Act specifically clarified that strict adherence to the original schedule is not required. It states that "notwithstanding Section 504 of the Rescissions Act (109 Stat. 212), the Secretaries in their sole discretion determine the priority and timing for completing required environmental analysis of grazing allotments based on the environmental significance of the allotments and funding available to the Secretaries for this purpose." Since then, the original National Allotment NEPA Schedule has been

1  modified four more times, in 2008, 2011, 2014, and 2017. The current schedule

2  spans 12 years, from 2017-2028 ("2017-2028 Allotment NEPA Schedule").

3  **D. Administrative Procedure Act**

4  51.   Agency actions taken pursuant to NMFA and NEPA are reviewable by

5  this Court under the APA, 5 U.S.C. §§ 702, 704, 706. The APA provides that "[t]he

6  Court shall … hold unlawful and set aside agency action . . . found to be . . . arbitrary,

7  capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

8  § 706(2). In making this determination, the Court must rule *de novo* all questions of

9  law and statutory interpretation. *See Loper Bright Enters. v. Raimondo*, 603 U.S.

10  369, 412-13 (2024) (courts "may not" defer to agencies on questions of law or

11  statutory authority).

12  52.   The APA also provides that "[t]he reviewing court shall … compel

13  agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

14  **V.    FACTS**

15  **A. The Colville National Forest**

16  53.   The territory of the Colville Forest was shaped over 10,000 years ago

17  by Ice Age glaciers that carved three major valleys of today's Columbia, Sanpoil-

18  Curlew, and Pend Oreille rivers, the latter two of which flow north into Canada

19  before entering the Columbia River. The Forest was designated as a national forest

20  reserve in 1907.

54.     The current Colville National Forest spans 1.1 million acres in Ferry, Stevens, and Pend Oreille Counties in northeast Washington. It is bordered to the north by British Columbia, Canada, to the west by the Okanogan-Wenatchee National Forest, to the east by the Idaho Panhandle National Forests, and to the south by a portion of the Confederated Tribes of the Colville Reservation. It encompasses two major mountain ranges, the Selkirk Range and the Kettle River Range, and includes the Salmo-Priest Wilderness.

55.     The Forest is largely comprised of densely forested, rugged terrain, including old-growth forests, and peaks rising to 7,000 feet. It includes elevational habitat zones ranging from old growth cedar forest to subalpine peaks, interspersed with dramatic cliffs and vibrant meadows. The Forest includes many sensitive riparian habitats, including dozens of lakes, and countless rivers, creeks, streams, and springs.

56.     The Forest supports a wide range of recreational uses, including wildlife-watching, hiking, backpacking, camping, horseback riding, cross-country and downhill skiing, mountain biking, hunting, and fishing. The Forest has 486 miles of hiking trails, including approximately 300 miles of the Pacific Northwest National Scenic Trail. The Forest Service estimates that there are approximately 335,706 recreational visits to the Forest each year, which generate an estimated 195 jobs and

$3,556,000 in annual labor income. *See* 2019 Final Environmental Impact Statement ("2019 FEIS") at 622.

57.     The Forest contains habitat for a wide variety of fish, wildlife, and plant species, including many species that are listed at the federal and/or state level as endangered and threatened, and species designated by the Forest Service as "sensitive," because their regional viability is a concern. These species include the federally threatened Canada lynx, grizzly bear, yellow-billed cuckoo, bull trout, wolverine, and whitebark pine,[6] as well as the gray wolf, a state-endangered species and Forest Service Region 6 "sensitive species." The Forest also contains a significant elk herd, and populations of bald eagles, bighorn sheep, moose, cougars, black bears, and bobcats. The Forest provides habitat connectivity for wildlife moving between the Cascade, Rocky Mountain, and upper Columbia mountains sub-range, including the grizzly bear, wolverine, wolf, and Canada lynx.

//

---

[6] The wolverine and whitebark pine were candidates for federal listing at the time the Forest Plan was adopted, and have since been listed as threatened species. *See* 88 Fed. Reg. 83726 (November 30, 2023) (final rule listing the contiguous U.S. "distinct population segment" of North American wolverine); 87 Fed. Reg. 76882 (December 15, 2022) (final rule listing whitebark pine).

### B. Livestock Grazing in the Colville National Forest

58.     Despite inhospitable terrain and sparse forage, the Forest has long been heavily grazed. Relatively large numbers of sheep and cattle grazed the Colville during the 1920s through the 1940s, with cattle utilizing the lower elevations and sheep grazing the higher elevations, especially in the Kettle River Range. During the 1950s, most sheep grazing ceased on Forest allotments. The Forest now has only one allotment set aside for sheep grazing, the Graves Mountain allotment, and it is currently vacant.

59.     The Forest Service reports that livestock grazing in the Forest currently generates approximately 98 jobs and $1,524,000 in annual labor income, or about 40% of the value that the Forest Service estimates is brought to the local economy through Forest recreational uses. 2019 FEIS at 603.

60.     The Forest Service reports that grazing allotments cover about 745,000 acres of administered Forest lands in the Colville Forest, although analysis of raw Forest Service data obtained through public disclosure requests suggests that number is actually 787,927 acres. This acreage is divided into 58 grazing allotments, 47 of which it currently makes available for grazing.

61.     According to the Forest Service, only 38 of the 58 grazing allotments have ever had site-specific environmental analysis performed under NEPA. Many of these allotment-level NEPA reviews date back to the 1970s and 1980s. In 2005

and 2007, the Forest Service also "categorically excluded" grazing on several allotments from more thorough environmental analysis under NEPA, via exclusion from preparation of an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS"). All told, of the Forest's 58 grazing allotments, only five have had their AMPs updated since the last Colville Forest Plan was approved in 1988.

62.    Only 14 Colville allotments are on the 2017-2028 Allotment NEPA Schedule for environmental review in 2017-2028.[7] The Service has completed none of this analysis. It has already missed nine of the deadlines on this schedule, including cancelling the environmental analysis for one allotment that was scheduled to be completed by 2019. By the end of 2025, the Forest Service will have missed two more deadlines, as it has not started the process of analyzing the environmental impacts of continuing grazing on the two allotments that are scheduled for NEPA analysis this year.

63.    The Forest Service's intent to continue delaying allotment-level NEPA analysis for the Colville Forest is further evidenced by the agency's Schedule of Proposed Actions (SOPA). The Forest Service publishes a SOPA four times a year for the stated purpose of listing proposed actions for which it is currently conducting

---

[7] *See* https://www.fs.usda.gov/rangeland-management/documents/rescission/ NationalAllotmentNEPASchedule2017-2028.pdf.

COMPLAINT – 25

environmental analysis or for which it plans to "soon" begin environmental analysis. The most recent SOPA for the Colville Forest, however, includes only two allotments that were scheduled for environmental review in 2019 per the 2017-2028 National Allotment NEPA Schedule. Analysis for one allotment was cancelled, and review of the other is not estimated to begin until 2045 or be completed until 2048.[8]

64.    In 2023, the Forest Service began the process of reinitiating consultation with the U.S. Fish and Wildlife Service ("USFWS") under the Endangered Species Act ("ESA") to determine the impacts of reauthorizing grazing on 47 Colville Forest allotments on federally listed bull trout and designated bull trout critical habitat, Canada lynx, grizzly bear, North American wolverine and the yellow-billed cuckoo. The Forest Service was required to reinitiate ESA consultation to assess the impacts of reauthorizing grazing under the direction of the revised 2019 Forest Plan. It was also required to initiate a new ESA consultation process for grazing on the Colville Forest because prior consultation for some allotments is outdated and because the NEPA analyses and AMPs for several other allotments are so stale that they predate the federal listing of some species and thus no accompanying ESA consultation was previously conducted.

65.    Upon information and belief, the Service did not submit a draft

_____

[8] *See* https://www.fs.usda.gov/sopa/components/reports/sopa-110621-2025-07.pdf.

Biological Assessment for the reauthorization of grazing on the Colville Forest to USFWS for review and concurrence and/or preparation of a Biological Opinion until earlier this year. The Service also did not include federally listed whitebark pine in this consultation process specific to grazing on the Colville Forest, relying instead on a Region-wide programmatic consultation for the impacts of various activities on whitebark pine, which includes livestock grazing in all Region 6 national forests.

66.    Much of the Colville Forest consists of dense conifer stands. All told, 57% of the designated grazing allotments have canopy coverage greater than 60%, providing "little to no forage," while another 25% of the allotment area has 40-60% canopy coverage, which would provide "some" forage. As a result, 82% of the area within grazing allotments offers, at best, only marginal forage for livestock grazing.

67.    In the 2019 FEIS developed to support the Forest Plan, the Forest Service determined that only 281,999 acres of the land in the Forest (26%) are both capable of sustaining cattle grazing, and suitable for that use under any of the alternatives it considered. In all, the Forest Service deemed less than one-third of the acreage in current cattle grazing allotments are capable and suitable for grazing.

68.    For example, the Silver Creek allotment contains 25,353 acres, 87% of which is in the Forest, but the Forest Service deemed only 849 acres (3.4%) of that allotment suitable for cattle grazing. The Forest Service has never conducted any environmental analysis under NEPA of the effects of grazing on the ecosystems

COMPLAINT – 27

within the Silver Creek allotment, which operates under an AMP that was last updated in 1981. Similarly, the Churchill allotment consists of 17,032 acres, 90% of which is within the Forest, and the Forest Service has determined that only 2,523 acres (14.8%) is suitable for cattle grazing. Its AMP was last revised in 1985.





*Maps of the Silver Creek and Churchill grazing allotments, showing areas identified by the Service as suitable for grazing.*

**C. Harm to the Forest by Overgrazing**

69.    The continued overgrazing of the Colville Forest has dramatically altered native ecological communities, harming both upland and riparian habitat for a multitude of wildlife, fish, and plants by degrading vegetation, soils, and streams.



*These photographs from 2019 show a wetland springs in the Forest's Copper Mires allotment, before and after cattle trampled the area. (Photos courtesy of KRCG.)*

COMPLAINT – 29



*A September 2020 photo shows an overgrazed meadow and trampled riparian area in the Forest's CC Mountain allotment. (Photo courtesy of KRCG).*



*A photograph taken in June 2020 shows damage caused by cattle to a former pristine meadow in the Forest's Copper Mires allotment. (Photo courtesy of WWP).*

COMPLAINT – 30



*A June 2020 photograph shows extreme cattle trampling in a wet meadow where a salt block was placed (circled) on the Copper-Mires allotment. The area had been covered by grass the previous day, but because of the salt block placement and subsequent concentration of cows, the area had been turned to a mud pit. (Photo courtesy of WWP).*

70.    Because a large percentage of areas within grazing allotments do not produce enough forage for grazing, cattle amass in the few areas with sufficient forage, resulting in overgrazing in those areas, and significant damage to sensitive meadow and riparian habitats. Livestock grazing has caused significant degradation

of fish habitats, riparian areas, and water quality and quantity. It has widened stream channels, reduced stream shade, destroyed overhanging banks, elevated erosion and consequently increased sedimentation, compacted soils, and exacerbated seasonal water temperature extremes in streams.

71.    Continued overgrazing under the Forest Plan will continue to damage riparian areas and prevent their recovery. Merely applying riparian forage utilization standards is an ineffective approach to restoring and protecting areas degraded by livestock, because livestock damage habitat from trampling and chiseling banks and vegetation, as well as browsing and grazing. In order to protect these areas and allow them to rejuvenate, it is critical to reduce livestock access to them.

72.    Overgrazing also increases the risk of serious fires, by destroying the herbaceous understory and consuming grasses that would otherwise regulate the development of new tree seedlings, thus transforming healthy forests into dense stands of fire-sensitive and disease-susceptible species.

73.    Continued overgrazing will result in the continued spread of noxious weeds, both by the cattle themselves and by the increased vehicle traffic to care for the cattle.

74.    Upland range areas are the last used and often most impacted by livestock grazing, which occurs in these areas from mid-August through October, during a time of great weather fluctuation. This results in tremendous displacement

1    of soil, loss of the shrub layer, damage to trails, and destruction of sub-alpine

2    meadows.

3        75.    Grazing is also a source of conflicts with native predators, including

4    wolves, bears, cougars, and coyotes. Livestock stranded in densely forested terrain

5    with little forage often become lost, injured, and trapped in downed trees, and it is

6    impossible for them to bunch together in large groups for protection. As a result,

7    they are easy prey for native predators. In response, state and private entities kill

8    large numbers of native predators, including wolves, bears, and cougars, within

9    Colville Forest in a futile attempt to defend domestic livestock that the Forest

10   Service allows to graze on unsuitable and indefensible terrain.

11       76.    Grazing allotments overlap with recreational trails used by hikers,

12   backpackers, mountain bikers, and motorized recreationists. Summer hikers on the

13   Pacific Northwest Trail encounter livestock, feces, dust-choke from cattle churn on

14   trails, contaminated water, and confusing braided trails. In particular, overgrazing in

15   the Kettle Crest region is resulting in the serious degradation of valued recreational

16   resources, including a spectacular stretch of the Pacific Northwest Trail running

17   along the Kettle Crest. Hikers accustomed to high quality air, water, and trails do not

18   return after they encounter these conditions, resulting in a loss to the local economy.

19   //

20   ///

**D. The Colville's Forest Plan Revision**

77.    The Forest Plan was last updated in 1988 and was due to be revised by 2003 at the latest. In 2004, the Forest Service began the public scoping process for revising the Plan. More than a decade later, in January 2016, the Forest Service released a draft programmatic EIS ("DEIS") and a draft revised Forest Plan ("2016 Draft Plan"). The DEIS evaluated six alternatives, all of which contained essentially identical grazing provisions.

78.    Plaintiff Kettle Range Conservation Group submitted detailed comments on the draft DEIS and the 2016 Draft Plan, raising concerns about the ecological effects of grazing on riparian, hydrologic, and aquatic functions within the Forest and beyond.

79.    In September 2018, the Forest Service released a revised EIS ("2018 EIS"), a revised Forest Plan ("2018 Draft Plan"), and a draft Record of Decision ("Draft ROD") for the revised Forest Plan.

80.    Pursuant to the Forest Service's administrative review process (also referred to as the "objection" process, described in 36 CFR 219 Subpart B of the 2012 NFMA planning rule), all Plaintiffs filed objections to the 2018 EIS, the Draft ROD, and the 2018 Draft Plan. Those comments raised a wide range of issues pertaining to livestock grazing in the Forest, and the Forest Service's analysis and

1    regulation of grazing in the 2018 Draft Plan, including the issues raised in this

2    Complaint.

3        81.    Following objection meetings in April 2019, the Forest Service issued

4    a final ROD approving and adopting the Forest Plan and the 2019 FEIS (collectively,

5    "Final Plan Documents"). The ROD, signed on October 21, 2019, is a final agency

6    action subject to judicial review. It is intended to be the governing Forest Plan for

7    the next 15 years (Forest Plan at 9)—but, if history is any indicator, it may be in

8    effect for much longer.

9        82.    The draft and final versions of the EIS generally describe the process

10    for analyzing the capability and suitability of the land in the Colville Forest for

11    grazing. *See* 2019 FEIS App. G, Part VI. But the Plan documents do not disclose the

12    data or analysis that the Forest Service used to determine which lands are capable

13    and suitable for grazing, or specifically identify the lands determined to be capable

14    and suitable. The 2019 FEIS includes four small maps displaying the results of the

15    capability and suitability analyses, but the maps lack adequate detail or resolution to

16    meaningfully identify to the public which lands the Forest Service deemed capable

17    and suitable for grazing, to allow any evaluation of the results of that analysis by

18    allotment, or to compare in any meaningful detail the differences in the lands deemed

19    capable or suitable in the various drafts of the EIS and Forest Plan. *See* 2019 FEIS

20    at 1328-30.

83.    The Final Plan Documents reveal the Forest Service's determination that 628,740 acres within the Forest are capable of supporting cattle grazing. 2019 FEIS at 1325. The Forest Service only deemed 281,999 of these acres as suitable for cattle grazing under all the action alternatives.[9] 2019 FEIS at 1325.

84.    Under the Forest Service's analysis, this means that although cattle grazing is allowed in at least 66% of the Forest (about 727,726 acres), less than 26% of the Forest (281,999 acres) is both capable of sustaining cattle grazing and suitable for that use. Of the acreage the Forest Service deemed suitable for cattle grazing, 225,745 acres are within current cattle grazing allotments—consisting of about 31% of those allotments.

85.    Even this is an overestimate. Among other flaws in its analysis, the Forest Service considered land with tree cover between 60% and 70% as capable and suitable for livestock grazing, even though it concedes that land with canopy cover greater than 60% would "likely provide little to no forage." *See* 2019 FEIS at 650, 1325.

———————————

[9] Only the "no action" alternative contained a different suitability number. It identified 284,082 acres as suitable for cattle grazing. Each of the alternatives eliminated some of that acreage due to the addition of wilderness areas.

86.    Although grazing suitability is supposed to involve an "analysis of the "economic and environmental consequences" of using certain land for grazing, and an evaluation of the "alternative uses forgone," 1982 Rules § 219.3, no such analysis took place in the Final Plan Documents. Rather, the amount of land deemed suitable for grazing is identical under all action alternatives considered in the 2019 FEIS, and the suitability analysis includes no evaluation of the alternative uses forgone, or the economic and environmental consequences of the suitability determination. 2019 FEIS at 1328.

87.    The Forest Service made no adjustments to grazing in the Colville Forest in light of its conclusions as to capability and suitability. As the FEIS states, the Forest Plan does not change the "number of livestock, the intensity of grazing, or the amount of area grazed." 2019 FEIS at 539 (describing the alternative selected in the Forest Plan). It also includes no adjustments to "the status, location, or boundaries of permitted range allotments or type of livestock." 2019 FEIS at 438. The Forest Plan thus continues to allow the same number of cattle to graze at the same level of intensity and on the same grazing allotments, despite its determination that nearly 70% of the land in these allotments is neither capable nor suitable for cattle grazing, with some allotments having less than 3% of their land suitable for cattle grazing.

COMPLAINT – 37

88.     The Final Plan Documents contain no rationale to support the Forest Service's decision to continue to allow widespread grazing on land that it deemed to be not capable or not suitable for supporting grazing. Instead, the 2019 FEIS disclaims that the capability and suitability analysis is not designed to serve any particular purpose, emphasizing that it was "not a decision to graze livestock on any specific area of land," was not a "decision about, or estimate of, livestock grazing capacity," and that it "may or may not provide supporting information for a decision to graze livestock on a specific area." 2019 FEIS at 1323.

89.     The 2019 FEIS acknowledges that historic overgrazing has "degraded range conditions," that it has had "negative effects on some important unique habitats such as riparian areas and meadows," and that "many riparian habitats are in poor condition due to the effects of past and current grazing." 2019 FEIS at 483, 496.

90.     The 2019 FEIS does not, however, analyze the effects of allowing continued overgrazing, including grazing in areas that were not capable of supporting grazing or not suitable for that purpose. The 2019 FEIS does not examine the effects (direct, indirect, or cumulative) of the Forest Service's decision to continue to allow grazing on land that was not deemed capable or suitable on conflicts between livestock and wildlife, or on the health of the Forest ecosystem,

including fish and wildlife habitat, riparian areas, soil and water resources, erosion, and the diversity of plant and animal communities.

91.    For the lands in the grazing allotments, the Forest Service did not estimate the present and potential supply of forage for livestock, or the capability of those lands to provide suitable food and cover for wildlife species.

92.    In addressing the condition and trend of the land in the allotments designated for grazing, the Forest Service relies on data that it characterized as "limited." 2019 FEIS at 651. The Forest Service concedes it lacks "[k]nowledge and synthesis of current monitoring data for annual livestock use indicators, such as stubble height, bank alteration within the active floodplain and woody species utilization." *Id.* at 657.

93.    The long-term analysis completed by the Forest Service relies upon data from 15 monitoring sites that were "relocated" between the time they were first established approximately 60 years ago and the time they were last "inventoried" in 2002 and 2005. 2019 FEIS at 651. Of these 15 long-term monitoring sites, the 2019 FEIS indicates forage conditions were "fair" for four and "poor" for four, and that the trend after 30 to 50 years was up for two sites, down for four sites, and static for the remainder. *Id.* The Forest Service provides no support for its conclusion that "the majority of long-term monitoring sites show an improvement in condition and trend." *Id.*

94.     Although the 2019 FEIS claims that "[e]cological conditions and trends in forage areas have been evaluated annually (utilization and actual use) and extensively (long-term monitoring sites) during the allotment NEPA process for each allotment," it provides no data from any such annual evaluations, and concedes that 20 of the allotments have *never* undergone NEPA analysis. 2019 FEIS at 651-52.

95.     The Final Plan Documents do not incorporate or discuss the grazing suitability and capability analysis, or the Forest Service's conclusions as to which lands are capable and suitable, into any other part of the Plan or the analysis of the impact of grazing on wildlife, habitats, ecosystem health, or other uses, including recreation.

96.     The alternatives evaluated in the 2019 FEIS do not include the comparison of potential suitability determinations, as the amount of land deemed suitable is the same across all alternatives. The 2019 FEIS also does not evaluate any alternatives: (a) exploring different levels of grazing intensity or different options for areas on which grazing would be allowed, (b) analyzing the effect of various grazing alternatives on competing management objectives such as recreational and ecological values, or (c) evaluating and comparing the effect of various alternatives on the overall monetary and non-monetary social and economic value produced by the Forest.

97.    By the Forest Service's own characterization, "projections of cattle grazing are the same across all alternatives." 2019 FEIS at 603. None of the alternatives in the 2019 FEIS consider any reduction in the total number of livestock allowed onto Forest allotments, changes to the time frame during which livestock are allowed to graze, adjustments to any allotment boundaries, the closure of any allotments to grazing, or the imposition of any area restrictions within allotments. Nor did the 2019 FEIS analyze a "no grazing" alternative.

98.    The Final Plan Documents do not contain a cost-benefit analysis of grazing in the Forest. In particular, none of the documents analyze the direct monetary expense of grazing to the Forest, or the costs of grazing in terms of its adverse effects on other uses and values in the Forest, and adverse effects on biological diversity.

99.    The only attempt in the Forest Plan to address the harms of overgrazing are in the form of "standards" and "guidelines" to be incorporated into allotment-level plans. The standards include vague requirements, such as that livestock grazing should be managed to "move toward aquatic and riparian desired conditions," with the possibility of modifications or removal of livestock if those conditions are not met. *See* MA-STD-RMA-08 (Forest Plan at 122).

100.    However, most of the regulation of grazing in the Forest Plan is through "guidelines" to be *considered* during site-specific decision-making processes, such

1    as during allotment-level NEPA reviews or when issuing AOIs. These guidelines

2    include some criteria that might be used to mitigate the harm of overgrazing to some

3    areas, such as minimum stubble heights, percentages of vegetation that may be used,

4    and restrictions on streambank alteration. *See, e.g.*, Plan at 126 (MA-GDL-RMA-

5    12, Annual Grazing Use Indicators). However, the Forest Service rejected

6    alternatives that would have established these guidelines as "standards," which

7    would have imposed enforceable restraints at the allotment level.

8    **E. Implementation of the Revised Forest Plan**

9        101.   The Final Plan Documents do not impose, or require the Forest Service

10   to impose, any meaningful restrictions on grazing activity.

11       102.   The ROD emphasizes that the Plan only "designates management areas

12   as suitable or not suitable for grazing." 2019 ROD at 15. The Plan took no action

13   based on these designations, and the ROD states that "[a]ll other grazing decisions

14   will continue to be made at the allotment level." *Id.* Far from indicating that these

15   allotment-level decisions should be used to constrain grazing consistent with the

16   suitability and capability analysis, however, the ROD suggests that "[s]ite-specific

17   analysis at the allotment scale has the potential to allow for an *increase* in grazing

18   capacity." *Id.* at 10 (emphasis added).

19       103.   The Draft ROD provided that existing term Grazing Permits would be

20   modified through AOIs to conform with Forest Plan direction in the operating season

after the final ROD is signed. Draft ROD at 36-37. Similarly, the 2018 EIS provided that "grazing would continue to be managed through the annual operating instructions for each allotment." 2018 EIS at 1120; *see also* DEIS at 522 ("Annual operating instructions for livestock Grazing Permittees should ensure livestock numbers are balanced with capacity and address any relevant resource concerns (e.g., forage production, wildlife, weeds, soils, etc.))."

104.   The final ROD, however, eliminates mention of making changes in AOIs, indicating instead that "permits for ongoing uses will continue under direction contained in the existing permits that are compliant with the 1988 plan until such time as a project-level analysis is completed that incorporates revised land management plan direction." ROD at 53.

105.   In Appendix B to the 2018 Draft Forest Plan, the Forest Service indicates it will "[c]omplete environmental analysis and assess and update allotment management plans to improve allotment management and protect and manage the resources present within them." 2018 Draft Plan at 183. None of the Final Plan Documents, however, include any statements regarding updating the environmental analysis for the allotments or any schedule for doing so. Indeed, the Forest Service has no plans to even begin site-specific NEPA analysis for grazing on the vast majority of the Colville allotments for at least twenty more years, well after the Forest Plan is outdated and meant to be replaced.

106.    The 2019 FEIS indicates that livestock grazing is to be managed under an "adaptive management" strategy, "to match livestock numbers with annual forage production and resource needs based upon assessment and monitoring data." 2019 FEIS at 656. However, on information and belief, the Forest Service has not taken any steps to acquire the assessment and monitoring data that would be necessary to implement such a strategy, nor has it developed any plan to do so.

107.    Not only did the ROD eliminate the commitment to making changes in grazing through the AOIs, but the Forest Service recently stopped issuing AOIs for permit holders in the Colville Forest. Instead, the Forest Service now issues annual guidance by means of "Grazing Management Strategy Notes" based on annual meetings with the holders of Colville Forest Grazing Permits. Because the Forest Service has stopped issuing AOIs for the Colville Forest grazing allotments, the AOI Meeting notes, i.e., the "Grazing Management Strategy Notes," are final agency actions subject to judicial review. The "Grazing Management Strategy Notes" contain the same type of information as the documents the Forest Service previously labeled as AOIs.

108.    No changes were made during the 2020, 2021, 2022, 2023, or 2024 AOI Meetings/Grazing Management Strategy Notes to address the Forest Service's conclusion that nearly 70% of the land in current cattle grazing allotments is not capable or suitable for cattle grazing. No restrictions were placed to limit access of

livestock to areas deemed not suitable or not capable, or to reduce the number of cattle allowed to graze, the length of the grazing season, or the intensity of grazing to prevent additional harm from overgrazing. And no changes were made to implement any of the standards and guidelines contained in the Forest Plan to control the harmful effects of overgrazing. Upon information and belief, the Service also did not make any such changes during the 2025 AOI Meetings/Grazing Management Strategy Notes.

**F. Reissuance of Grazing Permits in the Wake of the 2019 Forest Plan**

109. The Service has reissued 10-year term Grazing Permits for 25 allotments since 2019, all without making any adjustments to account for the capability and suitability analysis in the Forest Plan. The Forest Service has not conducted any updated NEPA analysis for any of the Forest's active grazing allotments since issuing the revised Forest Plan and, according to its SOPA, it has no plans for doing so until at least 2045 and only for a single allotment—well after the expiration of the 15-year lifespan of the 2019 Forest Plan. The most recent NEPA analysis was in 2011, while the Service has not publicly examined the site-specific environmental impacts of grazing in some of the allotments for nearly 50 years.

110. On May 23, 2023, the Service issued a permit to Diamond M Ranch allowing a total of 783 head of cattle (cow/calf pairs) to continue grazing the Lambert, Hope Mountain, CC Mountain, Churchill, McKinley, and Copper-Mires

allotments, which collectively span 82,383 acres of federal lands in the Colville's northeast "Wedge" and the Kettle River Range. The Forest Service's 2019 analysis determined that only 41% of the CC Mountain allotment, 14.81% of the Churchill allotment, 51.49% of the Copper-Mires allotment, 13.75% of the Hope Mountain allotment, 43.5% of the Lambert allotment, and 33.93% of the McKinley allotment are suitable for cattle grazing.

111. The Forest Service continues to manage grazing on the six "Diamond M" allotments pursuant to the following: a 1976 "Environmental Analysis Report" and resulting AMP for the Copper-Mires allotment; three separate EAs and corresponding AMPs from 1979 for the Lambert, CC Mountain, and Hope Mountain allotments; a 1985 AMP for the Churchill allotment; a 1976 AMP for the McKinley allotment, which the Forest Service never updated despite preparing an EA for grazing on this allotment in 2001; and a 2007 Decision Memo that categorically excluded grazing management on the Hope Mountain and Churchill allotments, among other adjacent allotments, from environmental review in an EA or EIS and without subsequently updating the relevant AMPs.

112. Since 2012, Diamond M's grazing on the Colville Forest has been the source of recurring conflicts between state-listed endangered wolves and cattle. Diamond M leaves its cows and their vulnerable calves largely unattended for the summer grazing season, allows sick, injured and deceased cattle to stay out on the

COMPLAINT – 46

allotments, attracting wolves and other predators to its herds, and refuses to cooperate with the state wildlife agency in using non-lethal deterrents to prevent conflict. Many of these conflicts, especially within the Kettle Range, came after the Forest Service allowed Diamond M to continue grazing cattle near known wolf dens and active rendezvous sites. As the result of Diamond M's irresponsible grazing practices in these allotments, the state of Washington has killed 30 state-endangered wolves within the Forest, including destroying five entire packs.[10]

113.    The Diamond M allotments also contain habitat for federally threatened species. With the exception of the McKinley allotment, all contain core habitat for threatened lynx. Portions of the Churchill, Copper-Mires and Lambert allotments contain important high-elevation habitat for threatened whitebark pine. Threatened wolverine have been documented on the Churchill allotment.

114.    On May 15, 2023, the Service issued a permit to Jeff Dawson for continued grazing on the Meadow Creek allotment. On May 23, 2023, it issued another permit to Dawson for continued grazing on the Smackout and Aladdin

---

[10] All told, the Washington Department of Fish and Wildlife has killed 36 wolves on behalf of Diamond M and the family that operates Diamond M, the rest of which are largely related to predations on land outside the Colville Forest. This amounts to 70% of all the wolves WDFW has killed since wolves returned to Washington in 2008.

allotments. The Meadow Creek allotment spans 11,685 acres, only 30.71% of which were determined suitable for cattle grazing. The Smackout allotment spans 14,723 acres, only 25.3% of which were determined suitable for cattle grazing. The Aladdin allotment contains 14,204 acres of federal lands. The Forest Service analyzed the environmental impacts of grazing on these three allotments in a 2005 "Aladdin Complex" EA, which determined that "changes need to be made to grazing practices to improve unsatisfactory resource conditions on Smackout Creek, specifically water quality and riparian habitat, caused by livestock grazing." 2005 Aladdin EA, p.1. The 2005 EA also determined that the AMPs for these allotments, written in 1979 and 1981, were "outdated" and did not comply with management directives in the 1988 Forest Plan. *Id*.

115.   Grazing on the Smackout allotment has been the source of conflicts between state-listed endangered wolves and cattle, which have resulted in repeated subsequent lethal wolf removals. Threatened wolverine have been documented on the Aladdin allotment. Threatened grizzly bears may be present on all three "Aladdin Complex" allotments.

116.   On May 23, 2023, the Service issued a permit to Cody Sweat for continued grazing on the S. Fork Chewelah Creek and Cliff Ridge allotments. The S. Fork Chewelah Creek allotment spans 11,262 acres, only 16.61% of which were determined suitable for cattle grazing. The Cliff Ridge allotment spans 10,749 acres,

only 22.58% of which were determined suitable for cattle grazing. These two allotments are managed under AMPs adopted in 2010, following a 2009 NEPA analysis. Threatened wolverine have been documented on the S. Fork Chewelah Creek allotment and threatened grizzly bears may be present as well.

117.    On May 23, 2023, the Service issued a permit to Ace High Ranch, LLC for continued grazing on the Graphite allotment. This 5,607-acre allotment was categorically excluded from NEPA analysis in an EA or EIS in 2007 and is managed under an AMP adopted in 1976.

118.    On May 23, 2023, the Service issued a permit to Rosemary Eslick for continued grazing on the Jasper allotment. The Jasper allotment contains 7,693 acres, only 14.36% of which were determined suitable for cattle grazing. Lands within this allotment provide core habitat for threatened lynx and high-elevation habitat for whitebark pine. This allotment was also categorically excluded from NEPA analysis in an EA or EIS in 2007 and is managed under an AMP from 1976.

119.    On May 23, 2023, the Service issued a permit to L.D. Green to allow 375 head of cattle (cow/calf pairs) to continue grazing on the Lake Ellen allotment. The Lake Ellen allotment spans 20,237 acres, only 23.03% of which were determined suitable for cattle grazing. Lands within this allotment provide core habitat for threatened lynx and high-elevation habitat for threatened whitebark pine. The allotment continues to be managed under direction from a 1978 EA and AMP.

120. On May 23, 2023, the Service issued a permit to Grumbach & Son to continue allowing 266 head of cattle (cow/calf pairs) to graze on the Lone Ranch allotment. The Lone Ranch allotment spans 20,037 acres, of which 36.15% were determined suitable for cattle grazing. Lands within the Lone Ranch allotment provide core habitat for threatened lynx and high-elevation habitat for threatened whitebark pine. This allotment was categorically excluded from NEPA analysis in an EA or EIS in 2007 and is managed under an AMP adopted in 1976.

121. On May 23, 2023, the Service modified a permit to allow Shawn Hofstetter to continue grazing on the S. Fork Mill Creek allotment. The S. Fork Mill Creek allotment spans 23,058 acres, only 12.10% of which were determined suitable for cattle grazing. Threatened wolverine have been documented on the S. Fork Mill Creek allotment and threatened grizzly bears may be present as well. This allotment was categorically excluded from NEPA analysis in an EA or EIS in 2005 and is managed under an AMP adopted in 1982.

122. On May 23, 2023, the Service issued a permit to the Larsen Family LLC for continued grazing on the Middle Fork Mill Creek allotment. The Middle Fork Mill Creek allotment spans 8,099 acres, only 10.85% of which was determined suitable for cattle grazing. Threatened wolverine have been documented on the Middle Fork Mill Creek allotment and threatened grizzly bears may be present as well. This allotment was categorically excluded from NEPA analysis in an EA or

EIS in 2005 and is managed under an AMP adopted in 1963 (that may have been modified via an EA prepared in 1980).

123.    On May 23, 2023, the Service issued a permit to the Smith & Smith Partnership for continued grazing on the Nancy Creek allotment. The Nancy Creek allotment spans 10,073 acres, only 16.66% of which were determined suitable for cattle grazing. Threatened wolverine have been documented on the Nancy Creek allotment, which also provides core habitat for threatened lynx. Nancy Creek is managed pursuant to an EA issued in 1980 and an "interim" AMP from 1975.

124.    On May 23, 2023, the Service issued a permit to Bryan Gotham to allow 328 head of cattle (cow/calf pairs) to continue grazing on the Quartz allotment. The Quartz allotment spans 59,195 acres, of which 39.17% were determined suitable for cattle grazing. Lands within the Quartz allotment provide core habitat for threatened lynx and contain threatened whitebark pine. An AMP was last adopted for the Quartz allotment in 1982. The Forest Service later analyzed the environmental impacts of continued grazing on the Quartz allotment in a 2004 EA, but does not appear to have updated the AMP.

125.    On May 23, 2023, the Service issued a permit to Dave McClure to allow 127 head of cattle (cow/calf pairs) to continue grazing on the Swan Lake allotment. The Swan Lake allotment spans 25,114 acres, of which 53.5% were determined suitable for cattle grazing. An AMP for the Swan Lake allotment was adopted in

1976. The Forest Service later analyzed the environmental impacts of continued grazing on the Swan Lake allotment along with the Quartz and Trout Creek allotments in a 2004 EA, but again does not appear to have updated the AMP.

126.   On May 23, 2023, the Service issued a permit to Wayne Pond for continued grazing on the Twelvemile allotment. The Twelvemile allotment spans 6,886 acres, only 26.65% of which were determined suitable for cattle grazing. A revised AMP was adopted for the Twelvemile allotment in 2010.

127.   On May 27, 2021, the Service issued a permit to Reid Wilson to allow 223 head of cattle (cow/calf pairs) to continue grazing on the Tonata allotment. The Tonata allotment spans 16,741 acres, of which 57.51% were determined suitable for cattle grazing. The Tonata allotment is managed under an EA and AMP from 1997.

128.   On May 23, 2021, the Service issued a permit to Fountain Ranch for continued grazing on the LeClerc Creek and Tiger Hill allotments. The LeClerc Allotment spans a total of 22,203 acres, including 18,895 acres of federal lands in the LeClerc Creek watershed in the eastern part of the Forest, 24.29% of which was determined suitable for cattle grazing. The Tiger Hill allotment spans a total of 22,203 acres, including 17,829 acres of federal lands, to the northwest of LeClerc, 21.06% of which was determined suitable for cattle grazing. Both allotments are currently still managed under their first AMPs, with the AMP for LeClerc approved in 1982 and the AMP for Tiger Hill approved in 1980. According to the 2017-2028

National Allotment NEPA Schedule, NEPA analysis for the LeClerc Allotment was scheduled to be completed in 2019. The Tiger Hill Allotment does not appear on the 2017-2028 Schedule, and no NEPA analysis has been undertaken regarding grazing on the allotment since the Tiger Hill AMP was approved in 1980.

129.   Since the LeClerc AMP was first approved in 1982, the Service has made no fewer than three attempts to reinitiate the NEPA process and produce a new environmental analysis of the effects of authorizing grazing on the allotment. Its first attempt was in 1998, when it scoped the project as an Environmental Assessment ("EA"). That attempt failed, however, because "the EA was never finalized and a decision was not signed due to controversial issues the Forest did not have the capacity to address at the time." LeClerc Creek Grazing Allotment Management Planning Draft Environmental Impact Statement ("LeClerc DEIS") at 3.

130.   Another EA was scoped in 2013. The scoping letter for the EA indicated that analysis and a decision on the LeClerc Allotment was scheduled for 2013 according to the then current NEPA Allotment Schedule. It soon became clear, however, that the project might have significant effects and warranted an EIS, so that effort was abandoned.

131.   A third attempt was begun in 2014, when the LeClerc Creek Allotment Management Planning Project ("LeClerc Project" or "Project") was first scoped as an EIS. The scoping letter for the EIS was sent out on April 11, 2014, and a Notice

of Intent to prepare an EIS was published in the Federal Register on April 18, 2014. 79 F.R. 21892. The LeClerc DEIS was issued in September 2015, and a Notice of Availability was published in the Federal Register on October 2, 2015, initiating a 45-day comment period. 80 FR 59775.

132.   The LeClerc DEIS reveals that there are significant environmental concerns regarding the continued authorization of grazing on the LeClerc Allotment—concerns that were known and documented by the Forest Service for decades. The many issues discussed in the LeClerc DEIS include, but are not limited to:

1) the degradation of riparian resources resulting from cattle access to these areas, including over 32 miles of fish-bearing streams and over 12 miles of federally designated bull trout critical habitat;

2) cultural resource concerns raised by the Kalispel Tribe, including how the degradation from years of grazing to their Cultural Landscape has prevented part of the Kalispel membership from using the land for the gathering of traditional medicinal plants;

3) the lack of effective livestock movement controls, due in part to checkerboard land ownership and extensive private land within the allotment boundary, and resulting in increased utilization of range resources and degradation of riparian resources; and

4) the feasibility of successful allotment management, given the extraordinary financial and operational burden of constructing and maintaining the range infrastructure necessary to sufficiently manage cattle drift and mitigate for resource damage.

133.   The potential impact of continued grazing on the LeClerc Allotment to federally listed bull trout and designated bull trout critical habitat is of particular concern. The impacts of livestock grazing on fish habitat have been "well documented." 2017 Colville National Forest Biological Opinion ("2017 CNF BO") at 142. Grazing can cause soil erosion and sediment delivery to streams; loss of large woody debris; pool reduction; alteration or removal of riparian vegetation that provides shade and stabilizes stream banks; and altered channel morphology including channel widening and bank instability. *Id.*; Columbia Headwaters Recovery Unit Implementation Plan for Bull Trout at D-17. Grazing can also result in direct mortality to bull trout if livestock trample redds. 2017 CNF BO at 142.

134.   The Biological Evaluation/Management Indicator Species Report ("Fisheries Specialist Report") prepared for the LeClerc DEIS assessed the current habitat quality in the LeClerc Creek watershed as "not properly functioning." Fisheries Specialist Report at 26. Reauthorizing grazing would continue to "cause a downward trend to stream habitat conditions," including to designated bull trout critical habitat. *Id.* at 43.

135.   During the comment period for the LeClerc DEIS, concerns about grazing's impact to bull trout, bull trout critical habitat, and bull trout recovery efforts were expressed by Public Utility District #1 for Pend Oreille County, the Kalispel Tribe, Washington Department of Fish and Wildlife, Environmental Protection Agency, and United States Department of Interior,

136.   Pursuant to the ESA, the Forest Service was also required to consult with USFWS over the potential impacts of reauthorizing grazing to federally listed bull trout and their federally designated critical habitat. A portion of the LeClerc allotment is also within the Selkirk Mountains grizzly bear recovery area.

137.   Following review of the Forest Service's Biological Assessment and other supplemental information, USFWS issued a Biological Opinion ("the 2016 LeClerc BO") on March 11, 2016. Though the 2016 LeClerc BO concurred that impacts to bull trout are expected to be "insignificant," it did not concur with the Forest Service's "not likely to adversely affect" determination for critical habitat. 2016 LeClerc BO at 6, 31. The 2016 LeClerc BO concluded that although "significant adverse effects to critical habitat" are expected at the local level, those effects were not likely to rise to the level of "destroy[ing] or adversely modify[ing] designated critical habitat." 2016 LeClerc BO at 31.

138.   The 2016 LeClerc BO, however, only analyzed one of four alternatives identified in the 2015 LeClerc DEIS. The introduction to the 2016 LeClerc BO states

COMPLAINT – 56

1    that the Forest Service "requested consultation on Alternative D," and that

2    Alternative D was selected during analysis as the "most likely scenario and is

3    assessed in this Opinion." *Id.* at 6.

4    139.    Alternative D proposed reauthorizing grazing on the LeClerc

5    Allotment, but with substantial modifications and mitigation measures. Among other

6    changes, Alternative D would: modify the allotment boundary, including dropping

7    Fourth of July pasture and adding a pasture at Hanlon Meadows; specify a deferred

8    grazing rotation system with approximate dates of use for each pasture; specify new

9    range improvements to be constructed on the allotment, including additional fencing

10    to prevent cattle drift and to exclude cattle from sensitive riparian areas; provide for

11    three riparian Designated Monitoring Areas to implement Multiple Indicator

12    Monitoring protocols; and require the Forest Service to implement an adaptive

13    management plan to coordinate the monitoring of range and riparian resources and

14    adjust grazing according to utilization standards.

15    140.    Both USFWS's concurrence with respect to bull trout and its

16    conclusion that bull trout critical habitat would not likely be destroyed or adversely

17    modified were based on the specific modifications to grazing, robust mitigation

18    measures and monitoring requirements proposed in Alternative D.

19    141.    The 2016 LeClerc BO also includes conservation recommendations for

20    the proposed action that would "minimize or avoid adverse effects" even beyond the

mitigation measures already included in Alternative D. *Id.* at 33. Amongst other conservation activities, USFWS recommended that the Forest Service "consider relocating the LeClerc Allotment," and in the case that it could not move the allotment, "completely fence or exclude riparian and wetland areas that support native salmonids." *Id.*

142.    The 2016 LeClerc BO closes with a section on reinitiating formal consultation. The Reinitiation Notice states clearly that "formal consultation is required" if "new information reveals effects" not previously considered, or if "the agency action is subsequently modified in a manner that causes an effect" not previously considered. *Id.* at 34.

143.    The comment period for the LeClerc DEIS closed on December 16, 2015. 80 F.R. 76980. On June 29, 2018, the Forest Service published a Notice of Availability for the Project's Final Environmental Impact Statement ("LeClerc FEIS"), which would commence a 45-day objection period. 83 F.R. 30730. Within days of issuing this notice, however, the LeClerc FEIS was withdrawn, the objection period was canceled, and the LeClerc Project was put on hold indefinitely. 83 F.R. 31535.

144.    Upon information and belief, the Forest Service issued a permit to allow grazing on the Silver Creek allotment to continue in 2025 after the prior term permit expired on December 31, 2024. The Silver Creek allotment spans 25,353 acres, only

COMPLAINT – 58

3.35% of which were determined suitable for cattle grazing. Federally listed whitebark pine occurs on this allotment, threatened wolverine have been documented on this allotment, and threatened grizzly bears may be present as well. In 2005, the Forest Service categorically excluded grazing on the Silver Creek allotment from more thorough environmental analysis in an EA or EIS.

## VI.    CLAIMS

### FIRST CLAIM FOR RELIEF (NFMA)

*Failure to Consider Necessary Factors in Determining the Capability and Suitability of Land for Grazing under 2019 Forest Plan*

145.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

146.    NFMA and its implementing regulations require that in the planning process for the Forest, the Service determine the suitability and capability of lands in the Forest for grazing. In determining capability, the Service must evaluate the potential of an area of land to produce particular resources, such as forage to support the needs of both native wildlife and domestic livestock, and habitat for aquatic species like bull trout. 1982 Rules § 219.3, §219.20. In determining suitability, it must analyze the appropriateness of applying certain management practices to a particular portion of the forest, "as determined by an analysis of the economic and environmental consequences and the alternative uses forgone." *Id.*

147.   The Service acknowledged that land with greater than 60% canopy cover—and western hemlock plant associations—provide little to no forage, but it failed to exclude these lands from the land it deemed to be capable of supporting grazing.

148.   The amount of land deemed suitable for cattle grazing is identical across all action alternatives considered in the 2019 FEIS. The suitability analysis does not include any evaluation of alternative uses forgone by identifying any particular land as suitable for cattle grazing, or any analysis of the economic and environmental consequences of that determination. 2019 FEIS at 1328.

149.   As part of the planning process, NFMA and its implementing regulations require the Forest Service identify the condition and trend of land identified as suitable for grazing, 1982 Rules § 219.20(a), and obtain adequate data to support the planning process, 1982 Rules § 219.12(d). The Forest Service lacked, and did not obtain, adequate data to perform the required condition and trend evaluation. The limited data possessed by the Forest Service indicated that the condition of the grazing plots was trending downward.

150.   In determining the suitability of lands for grazing in the forest planning process, the Forest Service must consider possible conflict among livestock and the forest's wild animal populations and methods of regulating such conflicts. 1982

1    Rules § 219.20. The Forest Service's suitability analysis failed to adequately account

2    for livestock-wildlife conflicts and methods of regulating these conflicts.

3        151.    For the lands it identifies as suitable for grazing, NFMA and its

4    implementing regulations require the Service to estimate "the present and potential

5    supply of forage for livestock," and "the capability of these lands to provide suitable

6    food and cover for selected wildlife species." 1982 Rules § 219.20(a). The Forest

7    Service failed to estimate the present and potential supply of forage for livestock or

8    estimate the capability of lands grazed by livestock to provide suitable food and

9    cover for wildlife species.

10       152.    NFMA and its implementing regulations require the Forest Service to

11   estimate and compare the resource tradeoffs and opportunity costs associated with

12   achieving alternative resource objectives. 1982 Rules § 219.12(g). The Forest

13   Service failed to estimate the resource tradeoffs and opportunity costs, including

14   adverse impacts on other objectives and uses for the Forest, inherent in allowing

15   cattle grazing throughout the 66% of the Forest located in cattle grazing allotments,

16   and in particular on the large portion of that land that is not capable and suitable for

17   grazing. Performing such an analysis is critical to a meaningful comparison of

18   alternatives.

19       153.    The Service failed to gather the required data to make determinations

20   as to the capability and suitability of Forest allotments for supporting grazing, and

1  failed to adequately consider the data that it had regarding the capability and

2  suitability of these allotments for grazing. The Forest Service thus violated NFMA

3  by failing to consider the required factors in making its determination of capability

4  and suitability.

5      154.   The Final Plan Documents are therefore arbitrary, capricious, an abuse

6  of discretion, and not in accordance with law, and should be set aside pursuant to the

7  APA, 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF (NFMA & NEPA)
### *Failure to Adequately Identify Suitable and Capable Grazing Land in 2019 Forest Plan*

11      155.   Plaintiffs reallege and incorporate by reference the preceding

12  paragraphs.

13      156.   NFMA regulations require that a Forest Plan identify lands suitable for

14  grazing and capable of sustaining it. 1982 Rules § 219.20.

15      157.   NMFA also requires the Forest Service to "provide for public

16  participation in the development, review, and revision of land management plans."

17  16 USC §1604(d)(1).

18      158.   Moreover, NEPA "guarantees that the relevant information will be

19  made available to the larger audience." *Robertson*, 490 U.S. at 349. NEPA

20  regulations provide that "NEPA procedures must insure that environmental

1    information is available to public officials and citizens before decisions are made

2    and before actions are taken." 40 CFR §1500.1(b); *see also* 40 CFR §1506.6(a), (d).

3        159.   The 2019 FEIS describes generally the process for analyzing the

4    capability and suitability of the land in the Colville Forest for grazing, but none of

5    the Final Plan Documents disclose the data or analysis underlying the determination

6    as to which lands are capable and suitable for grazing, or adequately identify the

7    lands the Forest Service determined to be capable and suitable for grazing within the

8    Final Plan Documents.

9        160.   The Forest Service thus violated both NFMA and NEPA by adopting

10   the Forest Plan without making available to the public the data or analysis underlying

11   its determination as to capability and suitability, or meaningfully identifying the

12   lands it deemed capable and suitable.

13       161.   The Final Plan Documents are therefore arbitrary, capricious, an abuse

14   of discretion, and not in accordance with law, and should be set aside pursuant to the

15   APA, 5 U.S.C. § 706(2).

16             **THIRD CLAIM FOR RELIEF (NFMA & NEPA)**
17             *Failure to Use Forest-Wide Capability and Suitability*
18             *Determinations in 2019 Forest Plan*

19       162.   Plaintiffs reallege and incorporate by reference the preceding

20   paragraphs.

COMPLAINT – 63

163.   NFMA and its implementing regulations require that lands identified as suitable shall be managed in accordance with the Plan's direction. 1982 Rules § 219.20. The Forest Plan indicates that it will provide guidance, including "Determination of suitability and potential capability of lands for resource production (timber and grazing)." Forest Plan at 10. The Plan considers "suitability of areas" to be one of the decisions made by the Plan, or a "plan component." Forest Plan at 15. Actions taken to implement the Forest Plan, including allotment management plans, Grazing Permits and annual operating instructions, must be consistent with this suitability designation. Forest Plan at 12.

164.   The Forest Plan explains that "If the planning recommendation is that livestock use in these areas is incompatible, or the conflicts are incapable of being resolved in a satisfactory manner, these lands would be designated as non-suitable for the specific alternative for this planning cycle." Forest Plan at 1328. The Forest Plan does not, in fact, classify lands that it has identified as being unsuitable for grazing as lands that are not suitable for grazing. Forest Plan Table E-1 at 206. Failure to designate unsuitable grazing land as unsuitable for grazing in the revised Forest Plan is a violation of NFMA.

165.   NFMA requires that a forest plan "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives," 16 U.S.C. § 1604(g)(3)(B), 36

1    C.F.R. § 219.26 (1982), and must "determine forest management systems … and
2    procedures in light of … the availability of lands and their suitability for resource
3    management," 16 U.S.C. § 1604(e)(2).

4    166.   In the Forest Plan, the Forest Service determined that only 31% of the
5    land within current cattle grazing allotments is capable and suitable for cattle
6    grazing. Yet the Forest Plan does not make any decisions based on these
7    determinations. The Forest Plan does not restrict grazing to the capable and suitable
8    land, make any adjustments to the areas on which it will authorize grazing, or change
9    the amount, intensity or duration of grazing. In fact, the Forest Plan states explicitly
10   that the capability/suitability analysis should not even be taken to provide supporting
11   information for a future decision to graze livestock (or not) in a particular area.

12   167.   The Forest Plan violates NFMA, including its wildlife diversity
13   mandates, by failing to limit grazing in any way based on its analysis of grazing
14   capability and suitability, and by providing that changes in grazing requirements to
15   be made at the allotment level could be made without applying the Forest Plan's
16   required capability and suitability analysis eviscerating the 1982 Rules' requirement
17   that the planning process include an analysis of capability and suitability of the forest
18   lands for grazing.

168.   The Forest Plan is therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**FOURTH CLAIM (NFMA & NEPA)**
*Failure to Consider Range of Grazing Alternatives*

169.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

170.   NFMA regulations require the Forest Service, in developing the Forest Plan, to present, analyze, and consider a range of grazing alternatives in order to identify their impacts on recreational and ecological uses and values of the forest, and to compare the overall monetary and non-monetary value produced by the forest under various alternatives. 1982 Rules §§ 219.12(f), 219.20(b), 219.27.

171.   NEPA requires that the FEIS include and consider all reasonable alternatives to the proposed action. 42 U.S.C. § 4332(2)(C), (E); 40 C.F.R. § 1502.14.  The effects of livestock grazing were identified as an environmental issue during scoping and public comments, and the FEIS should have included alternatives that would mitigate those effects.  The range of action alternatives should have included a range of suitable acres and a range of projected numbers of livestock AUMs.

172.   The FEIS and the Forest Plan did not present or evaluate a reasonable range of alternatives (a) evaluating different suitability determinations that would exclude areas where grazing would have adverse effects on important resources, such as state- and federally-listed wildlife; (b) exploring different levels of grazing intensity or areas on which grazing would be allowed, including a "no grazing" alternative with no suitable acres, (c) analyzing the effect of various alternatives on competing management objectives including recreational and ecological values, or (d) evaluating and comparing the effect of various alternatives on the overall monetary and non-monetary social and economic value produced by the Forest.

173.   The Forest Plan is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

## FIFTH CLAIM (NEPA)
*Failure to take "Hard Look" at the Ecological Effects of Grazing*

174.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

175.   NEPA requires agencies to take a "hard look" at the consequences of prospective actions by "carefully consider[ing] detailed information concerning significant environmental impacts." *Robertson*, 490 U.S. at 349.

176.   NFMA requires that a forest plan "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives," 16 U.S.C. § 1604(g)(3)(B), and must "determine forest management systems … and procedures in light of … the availability of lands and their suitability for resource management," 16 U.S.C. § 1604(e)(2).

177.   NFMA and its implementing regulations require that a forest plan address a number of ecological considerations that would be affected by the allowance of grazing, the areas in which it is allowed, and the capability and suitability of the land to sustain grazing. These considerations include the maintenance of plant and animal communities and their habitat and diversity in order to meet multiple use objectives, the management of fish and wildlife habitat to maintain viable populations, conflicts between livestock and wildlife, conservation of soil and water resources, minimization of erosion, or protection of riparian areas. *See* 16 U.S.C. § 1604(g)(3)(B), 1982 Rules §§ 219.19, .20, .26 and .27.

178.   The Final Plan Documents do not discuss or incorporate the Forest Service's grazing suitability and capability analysis, or its conclusions as to which lands are capable and suitable for grazing, into any other analysis or requirements of the Plan, including the discussion of the ecological considerations listed in the prior

paragraphs, even though the suitability and capability of the Forest's lands for grazing has significant effects on each of those ecological considerations.

179.    NFMA and its regulations require that when forest plans are revised, existing permits must be revised as soon as practicable to be consistent with the revised forest plan. 16 U.S.C. § 1604(i). The Record of Decision for the revised Forest Plan includes a decision that this won't occur until project renewals (ROD at 42), which for 10-year term Grazing Permits may occur several years after the adoption of the Forest Plan.

180.    The analysis of effects in the FEIS is based on plan components in the revised Forest Plan. It fails to recognize that implementation of plan components for grazing through permit renewals and/or updated AMPs will be delayed to the point of being largely irrelevant and therefore ineffective and instead assumes they will be in place immediately.  The FEIS therefore fails to properly consider the effects of alternatives on any of the ecological considerations discussed above. This error includes the effects on threatened, endangered and sensitive fish and wildlife species, and extends to the Biological Assessment of the Plan's effects.

181.    The Record of Decision is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF (NFMA)

*Failure to Modify Site-Specific Grazing Authorizations as Soon as Practicable Following Revision of the Forest Plan*

182. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

183. NFMA requires that "permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). It also requires that "[w]hen land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable." *Id.*

184. The standard Forest Service 10-year term Grazing Permit includes language authorizing the agency to modify or cancel the permit "at any time during the term to conform with the needed changes brought about by law regulation, Executive order, allotment management plans, *land management planning*, numbers permitted or seasons of use necessary because of resource conditions, or the lands described otherwise being unavailable for grazing." The changes in the revised Forest Plan from land management planning must be incorporated into grazing authorizations as soon as practicable.

185. In the 2019 Forest Plan, the Service determined that only about 31% of its current cattle grazing allotments are suitable for grazing, and included many changes in plan components that pertain to grazing. Yet the Forest Service did not

1   make any changes to the existing AMPs, Grazing Permits, or to the grazing

2   requirements imposed through the 2020-2025 AOI/Grazing Strategy Meetings, to

3   account for this capability and suitability analysis, to prevent livestock from

4   continuing to graze on areas that it had deemed not capable of supporting or suitable

5   for grazing, or to prevent continued overgrazing from damaging the Forest.

6   186.   None of the renewed permits discussed in Section V(F) make any

7   mention of the Forest Plan's forest-wide suitability and capability analyses, nor do

8   they offer more detailed information about the relevant allotment's suitability and

9   capability for grazing by pasture. The recent AOIs or "Grazing Management

10   Strategy Notes" also do not contain any such information about these allotment's

11   forest-wide or allotment-specific suitability and capability for grazing. As such,

12   neither the renewed permits nor any other grazing instructions issued for the

13   allotments discussed in Section V(F) set any limits, conditions, or prohibitions on

14   grazing based on suitability and capability analyses. Accordingly, these agency

15   actions were arbitrary, capricious, an abuse of discretion, and not in accordance with

16   law, pursuant to the APA, 5 U.S.C. § 706(2).

17   187.   The Service's failure to exercise its authority to change the conditions

18   of its grazing authorizations in the Colville Forest to implement the Forest Plan's

19   findings, analysis, guidelines, standards, or requirements violate the NFMA and the

20   1982 Rule, and therefore constitute an agency action unlawfully withheld or

1  unreasonably delayed, and therefore should be compelled by a mandatory injunction

2  pursuant to the APA, 5 U.S.C. § 706(1).

3  **SEVENTH CLAIM (NFMA)**

4  *Failure to Ensure Grazing under Renewed Term Permits is Consistent with*
5  *the Revised 2019 Forest Plan's Management Directives*

6

7      188.   Plaintiffs reallege and incorporate by reference the preceding

8  paragraphs.

9      189.   NFMA requires that "permits, contracts, and other instruments for the

10  use and occupancy of National Forest System lands shall be consistent with the land

11  management plans." 16 U.S.C. § 1604(i).

12      190.   Pertinent direction in LRMPs relating to livestock grazing is included

13  in part 3 of the Grazing Permit. FSH 2209.13 § 91.2. Part 3 of the permit is described

14  as "Special Terms and Conditions" and lists the "specific management practices of

15  the permittee" or incorporates another "document which sets forth these

16  responsibilities in detail." The AMPs are incorporated into the Grazing Permits, but

17  none have been changed to be consistent with the 2019 Forest Plan, and the Forest

18  Plan does not set forth individual permittee responsibilities for particular allotments

19  in detail.  Therefore, the permit is the document that should explain how the revised

20  Forest Plan requirements would be met by the permittee.

191.   The Forest Plan includes many standards and guidelines that apply to livestock grazing management practices and the protection of natural resources like listed and sensitive species and their habitats. For instance, to ensure riparian areas are protected, MA-GDL-RMA-12, provides annual grazing use indicators that are to be used to maintain or improve vegetative and stream conditions, help ensure the viability of aquatic species, provide important contributions to the recovery of ESA-listed species, and facilitate attainment of State water quality standards.  The Forest Plan provides the indicators, but allows alternative indicators if they are "based on best available science and monitoring data and meet the purpose of this guideline."

192.   The renewed permits discussed in Section V(F) list a few "Annual Grazing Use Indicators" for each allotment from the Forest Plan's riparian management area guidelines, but do not indicate when or how frequently these indicators will be monitored, nor do they indicate how these monitoring guidelines will be considered in managing grazing on each allotment.

193.   The renewed term permits violate NFMA because they fail to ensure consistency with the 2019 Forest Plan's goals, desired conditions, objectives, standards, and guidelines.

194.   The renewed permits are therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

COMPLAINT – 73

# VII. REQUEST FOR RELIEF

Plaintiffs therefore respectfully request that this Court grant the following relief:

1. Hold unlawful the Final Plan Documents, under the judicial review standards of the APA, 5 U.S.C. § 706(2), because their adoption was arbitrary, capricious, an abuse of discretion, and unsupported by substantial evidence in the record, and because they violate NEPA and NFMA, or both, and therefore are not in accordance with law;

2. Remand the Final Plan Documents without vacatur, with instructions to revise them in accordance with the Forest Service's obligations under the APA, NEPA, and NFMA;

3. Declare that the Forest Service's allotment-specific grazing authorizations, including the renewed Grazing Permits and all post-2019 AOIs/Annual Grazing Strategy Meeting Notes, are unlawful under the judicial review standards of the APA, 5 U.S.C. § 706(2), because they violated NFMA, and are arbitrary, capricious, an abuse of discretion, or contrary to law;

4. Enjoin the Forest Service from continuing to authorize grazing on the Colville Forest allotments until such time as the Forest Plan, AMPs, Grazing Permits and/or AOIs/Annual Grazing Strategy Meeting Notes have been brought into compliance with the APA, NEPA, and NFMA;

COMPLAINT – 74

1    5. Enter such other declaratory relief, and temporary, preliminary, or permanent

2    injunctive relief as Plaintiffs may request;

3    6. Retain jurisdiction over this case until the Forest Service complies with

4    NEPA, NFMA, and the APA;

5    7. Award Plaintiffs their reasonable costs, litigation expenses, and attorneys'

6    fees associated with this litigation pursuant to the Equal Access to Justice Act, 28

7    U.S.C. § 2412; and

8    8. Grant such further relief as the Court deems just and proper.

Respectfully submitted this 20th day of October, 2025.

ANIMAL & EARTH ADVOCATES, PLLC

By    _____

Claire Loebs Davis, WSBA #39812
ANIMAL & EARTH ADVOCATES, PLLC
20520 105th Ave. SW
Vashon, WA 98070
Tel: (206) 601-8476
claire@animalearthlaw.com

WILDEARTH GUARDIANS

By    _____

Jennifer Schwartz, WSBA #38388
WILDEARTH GUARDIANS
213 SW Ash Street, Suite 202
Portland, OR 97204
Tel: (503) 780-8281
jschwartz@wildearthguardians.org

COMPLAINT – 75